MEMORANDUM OF DECISION
This case presents a petition for the termination of the parental rights of Donald and Deborah B. to their daughter Amber, now 3 1/2 years of age. The case originated with the Department of Children and Families (hereafter, "DCF") obtaining an order of temporary custody on September 12, 1995, and on May 16, 1996, the child was adjudicated neglected, and committed to DCF for a period of one year. Extensions of commitment were granted on May 8, 1997, April 23, 1998, and on January 15, 1999 to further order of the court. On January 12, 1998, DCF filed the petition for termination of parental rights.
The court finds that the mother and father have been personally served with the petition for termination, have appeared and have court-appointed attorneys. The court has jurisdiction in this matter and there is no pending action CT Page 5094 affecting custody of Amber in any other court.
Petitioner, DCF, alleges that the grounds for termination of parental rights are the failure of the parents to rehabilitate themselves after a finding of neglect, and the lack of an on-going parent-child relationship. Parents have denied the charges pending against them. On June 3, 1998, Alison F., a sister of mother, was permitted to intervene for dispositional purposes only.
FACTS
The court, having read the verified petition, the social studies and the various documents entered into evidence, and having heard the testimony of the witnesses, including a court-appointed evaluator, makes the following factual findings and reasonable inferences supported by these facts.
Mother, Deborah B.
Amber (then about three weeks old) was injured while in the parents' care on September 8, 1995, when she was scalded in hot water leading to second-degree burns over 30% of her body.[2]
She may have received a skull fracture at that time as well. The parents only sought medical attention the following day; after help was sought the child was immediately placed at Yale New Haven Hospital (YNHH). DCF sought an order of temporary custody on September 9, 1995, while Amber was a patient at YNHH, and the court granted the OTC on September 12, 1995.
Realizing that mother and father were in need of instruction on parenting skills to insure Amber's safety at home, DCF offered them a variety of remedial services. Mother and father were to attend five classes at Southern Connecticut State University commencing on January 20, 1996, to improve parenting skills. On February 7, 1996, expectations were entered into with DCF, and by the expectations the parents were, among other things, to complete the SCSU parenting classes and cooperate with family counseling. Parents were also expected to maintain adequate housing and income and safe conditions at home.
On February 22, 1996, Yale University Child Study Center's new program of Intensive Home-based Services for Children and Adolescents (YIHCAPS) was placed in B. family home. YIHCAPS sought to remove barriers to the reunification of Amber with her CT Page 5095 parents and her siblings. YIHCAPS was to assist by supervising visits and otherwise being in the home for teaching and counseling eight hours per week, three times a week. The agency also provided twenty-four hour service by pager.[3] On June 20, 1996, New Haven Family Alliance also became involved in assessing family dynamics and observing parent-child interactions. On January 30, 1997, at mother's request, Boys Village Youth and Family Services agreed to work with the family on techniques to increase parenting skills.[4] Other agencies and groups which worked with the family up to the filing of the TPR included the State of Connecticut Departments of Social Services and Mental Retardation (Birth To Three program), Visiting Nurse Association, Yale Child Study Family Support Services, a Parent Aide provided by Easter Seals, and Intensive Family Prevention Service. Another B. child, Donald J. (D.J.) was helped by Connecting Children and Families. From June to September, 1997, some of the parenting services supplied to the family for D.J. by Connecting Children and Families also were to assist the parents in their effort to reunify with Amber.[5]
Two DCF social workers testified as to mother's compliance with efforts to improve her parenting. The first was Elizabeth Adzenyah, who was assigned to this case from February 1995 until June 1997. The second was Sylvonia Spencer, who was assigned from June 1997 to December 1997. Each social worker testified that mother did not profit from the numerous services extended and made no significant progress toward being a better parent. Only the first session of the SCSU family clinic was attended on January 20, 1996 by mother (and father as well). The second session was canceled by the SCSU therapist. The four sessions in February, 1996, were not attended by the parents for different reasons, some unexplained. The therapist wrote asking the parents to indicate their interest by March 2, 1996, but they did not respond and the case was closed.
Mother's relationship with YIHCAPS was not successful. From February 22, 1996, to June 18, 1996, the clinician noted that mother had an inability to pay attention to her children, which was especially serious in light of the "impulsive and aggressive behaviors" of the children. Deborah also showed improper conduct in the "indiscriminate use of various friends to care for Amber." There was a decision made by DCF to move for a TPR in June, 1996. In July 1996, this decision was reversed and YIHCAPS was again placed in the B. home. CT Page 5096
From August 26, 1996, to October 26, 1996, a two-month trial period commenced with YIHCAPS. This period was characterized by the clinician as marked by mother's minimizing "safety issues in her home, an increase in Donald, Jr's aggressive behavior and Deborah . . . not focus[ing] her attention on her children. . . . [She] was unable to provide a safe home environment for Amber and Donald, Jr. and was unlikely to do so in the future." (Quotations in last two paragraphs from letter of P. Boretsky, exhibit B).[6]
During this time period a dispute arose between mother and YIHCAPS over the terms of the service contract between YIHCAPS and her. She refused to sign any contract that did not specify the date on which Amber would return home. After October 26, 1996, YIHCAPS did not perform any other services in the B. household. The case was formally closed on January 16, 1997.
One of mother's other children, D. J., had been removed from the home at the time of the granting of the OTC involving Amber (September 12, 1995). He was returned to the B. home on January 10, 1996, under an order of protective supervision. D.J. was again removed from the home on October 11, 1996, when he was admitted to YNHH intensive care. He had apparently spilled hot water on himself and had burns on 30% of his body. This incident with D.J. was cited by YIHCAPS as bearing on mother's ability to insure the safety of children in her home. (Exhibit B, page 2).
In January 1997, Boys Village In-Home Service Team began providing services to the B. family. On March 10, 1997, the clinician wrote that "it is my opinion that Mrs. [B] has reached maximum therapeutic gain." In a closing letter of April 7, 1997, the clinician concluded that Mrs. B. is not able to learn the skills needed for caring for Amber (and D. J. as well). In addition "she is unable to control her anger in the presence of service providers even when she knows we are assessing her abilities as a parent." (Exhibit C, letters of Christine Guay).
After June 1997 DCF had decided to move for a TPR. On July 2, 1997, there was an additional referral on the family. Two children at home — Felicia (Fifi) and Danielle — were left home alone unsupervised. The effort to work with Connecting Children and Families to improve parenting skills failed because parents attended only two of the training sessions and the agency canceled the rest of the sessions. In addition, mother refused to sign releases or give access to her house to DCF worker Spencer. CT Page 5097
Mother testified that she has tried to cooperate with DCF and service providers and took a course with New Haven Family Alliance in March, 1997, receiving a certificate of completion.[7] At the same time mother does harbor great resentment against DCF and spoke of it freely on the stand. (e.g. See transcript of January 15, 1999 at 93). The root of her dislike of DCF stems from an occurrence on September 12, 1995, when Amber was in YNHH recovering from her burns. Apparently DCF believed that Mr. B. was afflicted with a life-threatening illness and reported this information to Amber's physicians. This led to Amber's receiving globulin as part of her burn treatment. One vial of the globulin was later found by the State Department of Health to be contaminated with bacteria and this led to Amber's having a severe reaction that delayed her recovery. Even if DCF gave incorrect information to the hospital[8], it does not justify mother's overly-angry reaction and her failure to cooperate with DCF in improving her parenting abilities.
Not content with a broad-based attack on DCF, mother specifically takes the position in her post-trial brief that social worker Adzenyah acted inappropriately. The trial evidence shows that Adzenyah was told by a case worker from 4C's about father's health status.[9] Adzenyah passed this information on to her supervisor and Fifi's foster mother at her supervisor's direction. This ended Adzenyah's involvement in the incident. (See Transcript of January 13, 1999 at 92). Mother is again demonstrating her lack of control by her claims against Adzenyah. The final point to be made is that even if there had been a successful relationship between DCF and mother, there is clear evidence that mother was not physically or mentally capable of safely parenting Amber and her siblings at the same time.
 Father, Donald B.
Father co-signed expectations with mother on February 7, 1996. Father, like mother, was to improve his parenting skills. As indicated above, he only attended one of the SCSU parenting classes. He expressed disdain for such classes to DCF, stating that he did not need such assistance.
Father was often apologizing for his wife's losing her temper with DCF. He regularly visited Amber and attended reviews periodically held by DCF. He contends that more effort by DCF should have been made to reunify him with Amber. He notes that CT Page 5098 the service providers and DCF often set up their goals in terms of his wife's responsibilities, and not his. On the other hand YIHCAPS stated in its materials that the agency intended to work with the family, including Mr. B. YIHCAPS was available by pager 24 hours a day and was flexible with its weekend hours. With some initiative, father certainly could have made more use of YIHCAPS and other service providers to further reunification.
More important the father always has stated to DCF, and testified as well, (See Transcript of January 15, 1999 at 114, 129), that he is not the primary parent, only Mrs. B. has that role.[10] He saw himself required to leave the house for his employment and had no intention or ability to be a full-time caretaker for Amber.
Mr. B. has a more serious problem, alcoholism, which calls into question his ability to be an appropriate parent for Amber. Father had been directed to ABH on November 17, 1995 (See Social Study at 9). On numerous further occasions, father was reminded by DCF to obtain an evaluation of and treatment for his alcohol addiction. These requests were ignored. Mr. B. testified that he was not "ready" to obtain help for his alcohol dependence any earlier. (See Transcript of January 15, 1999 at 139). In September 1996, Mr. B. was possibly to provide more in-home care for his children while his wife took a job. He signed a set of expectations. The primary expectation was that father obtain an evaluation from Advanced Behavioral Health and then follow up on the recommendations. Again Mr. B. did not at that time go for his evaluation.[11]
Mr. B. did finally have an evaluation done by ABH on August 18, 1997, almost a year after signing the expectations. ABH recommended that he attend the APT Foundation's Substance Treatment Unit (SATU) to remedy his alcohol problem. Mr. B. did in fact attend SATU from August 25, 1997, until April 28, 1998. While Mr. B.'s progress was considered satisfactory during this period, he did have two problems with relapses, one before the filing of the TPR and one after. On November 7, 1997, he had a dispute with his employer and went to a bar, consuming part of a glass of beer. On February 9, 1998, he "slipped" by having a drink at a bar; he agreed with SATU to extend his program into April 1998 because of this.
Subsequent to the completion of the SATU program, Mr. B. was following up in April with his treatment by attending an CT Page 5099 Alcoholics Anonymous' Twelve-Step program three times a week. Since then he has decreased his participation in AA to once a week. In addition in September 1998 he was asked by Mrs. B. to leave the house for a few days and to stay with her sister, Alison F., as he had an alcoholic episode.[12]
Visitation[13]
Initially in 1995 visitation between the parents and Amber took place in their own home. DCF concluded that the visits were not safe for Amber because her siblings were treating her too roughly and Mrs. B. was not adequately protecting her. Visits were then set up at DCF headquarters on Long Wharf Drive. The parents took advantage of the visits in most instances, although mother expressed her frustrations over having to find babysitters. Father changed his work schedule in order to attend.
Visits were increased to weekly in September, 1997, even as DCF prepared to file a TPR petition.[14] In April 1998, after the filing of the TPR, visitation was reduced to two times per month. According to social worker Paulette Limato visitation was decreased because Amber was becoming increasingly "symptomatic" after visitation. Mrs. B. was not compliant with visitation from March 1998, except for once at psychologist Berkowitz office in August 1998. Father did continue visits until September 22, 1998, when visitation ceased on Dr. Berkowitz' recommendation. Amber was aware of her parents at the visitation sessions, but did not have any bond with them or initiate any interaction with them or her siblings.
Dr. Berkowitz and Dr. Kaplan
Dr. Barbara Berkowitz, a psychologist, was appointed the evaluator for the court and was designated an expert in clinical psychology. Dr. Berkowitz concluded in her report of September 13, 1998 (subsequent to the filing of the TPR) that Mrs. B. was of borderline intelligence and showed characteristics of a paranoid type. She was fixated on the incident with the contaminated globulin at YNHH. Rather than making efforts to improve, as best she can, she has taken to blaming the DCF and the service providers for various setbacks in Amber's life. Mother's abilities to parent would not improve in the future; rather she would repeat the same mistakes as before if reunited with Amber. With regard to Mr. B., Dr. Berkowitz concluded that Mr. B. has not resolved his alcoholic dependence. He could not CT Page 5100 remember when he had his last drink and is not committed to after-care.[15] He has no understanding of Amber's special needs and has no plan for her other than that she return to his home. Mr. B. confirmed that Mrs. B. harbored hatred for DCF. He also stated that Mrs. B. was the primary parent in the household.
Dr. Berkowitz observed that Amber ignored her biological parents at their session with her. In contrast the doctor observed a loving relationship with the foster parents. They are her psychological parents. Dr. Berkowitz recommends that a TPR be granted; she concludes: "To remove her from her psychological parents, and replace her with the family in which she was traumatized and almost died, would be to wreak havoc with her attachment process and psychological fragility. She deserves to NOT be placed at such risk."
At the request of DCF, Amber was evaluated on November 30, 1995, April 30, 1997, December 1, 1998, and December 17, 1998, by child psychiatrist Michael Kaplan. He found that Amber has deficiencies in gross and fine motor development and in the following other areas: problem-solving, language, social skills. From his most recent meeting with Amber, Dr. Kaplan concluded that steady progress is being made in removing Amber's developmental delays. She is an "attractive, delightful little girl" who requires "a permanent, secure, and safe environment to maintain and develop the motor and cognitive skills required for future development. Disruption of her environment will likely place her at risk for further delays."
Alison F.
Alison F., Mrs. B.'s sister, urges that should an adjudication be made here, that she receive custody of the child in Amber's best interests. She attended an evaluation session with Dr. Berkowitz. The doctor concluded that Mrs. F. could generally provide an adequate home for Amber (DCF similarly made this conclusion after a home study). She had several concerns, however. She had presented herself only when the child was two and one-half years old, well after Amber had bonded with the foster parents. Secondly she had no knowledge of Amber's condition[16], except as it had been explained to her by Mrs. B. She therefore could not set forth an appropriate plan for Amber. Finally the evidence clearly showed that Alison F's. main goal was to assist her sister, so that the access to Amber by Mrs. B. would continue without any control by F. herself. CT Page 5101
The interactional session between Alison F. and Amber was pleasant, but Amber did not have any idea that she was in the presence of her aunt. As a stranger, there was no bond between F. and Amber.
Amber
DCF's addendum to the Social Study filed December 1, 1998, summarizes Amber's current condition: "Amber has been in placement since she was six weeks old. Amber is now 3 1/2 years old. Amber is a child with special needs and she requires permanency and a sense of personal security now. Amber is in a safe and nurturing home where she continues to make strides developmentally."
ADJUDICATION
The court finds by clear and convincing evidence, as of January 12, 1998[17], that DCF must prevail against mother on one of the grounds urged at trial-failure to rehabilitate. Initially the court makes the finding required by General Statutes § 17a-112(c)(1)[18] that DCF made reasonable efforts to locate to mother and to reunify the child with the parent. The findings of fact set forth above leave no doubt that DCF was in constant contact with Mrs. B. had no difficulty locating her.
The court has noted the repeated efforts of DCF to provide services to Mrs. B. as a means of reunifying the child with Mrs. B. Among the service providers was YIHCAPS, New Haven Family Alliance and Boys Village. The service providers concluded that in part Mrs. B. was reluctant to accept services. The providers also recognized that Mrs. B's mental limitations restricted her ability to advance to the point where she could sufficiently develop appropriate parenting skills. Under these circumstances and in light of the efforts made by DCF, the court finds that reasonable efforts to re-unify have been established.
Mother has failed to rehabilitate herself as required by General Statutes § 17a-112(c)(3)(B). Amber was committed as neglected on May 15, 1996, and, on January 12, 1998, mother had failed to achieve such a degree of personal rehabilitation as would encourage the belief that, within a reasonable time, she could assume a responsible position in her child's life. As CT Page 5102 indicated, the service providers did not believe that Amber would be safe in her mother's home. Mrs. B. was unable to take care of more than one child at a time. Amber, in her developmentally-delayed condition, would come to harm at the hands of one of her siblings or might harm herself by accident. In addition Mrs. B. had mental limitations to improving her parenting skills and had reached her maximum therapeutic gain. Mother cannot, on this record, resume a constructive and useful role as a parent in any reasonable time. In re Migdalia M.,6 Conn. App. 194, 203, 504 A.2d 532 (1986). See also In reLuis C., 210 Conn. 157, 166, 554 A.2d 722 (1989); In reAnna B., 50 Conn. App. 298, 307 (1998) ("respondent had poor parenting skills, intellectual limitations and a personality disorder;" TPR adjudication affirmed on appeal). She lacks "appropriate adult judgment." In re Pascacio R.,52 Conn. App. 106, 115 (1999).
The failure to meet expectations is also evidence of a failure to rehabilitate. In re Shavoughn K., 13 Conn. App. 91,100, 543 A.2d 1243 (1987). Mrs. B. did not comply with the requirements of parental counseling and keeping a safe home as set forth in the expectations of February 7, 1996.
Mr. B. failed to rehabilitate himself as well under General Statutes § 17a-112(c)(3)(B), under the standard of clear and convincing evidence.[19] First the court finds that DCF has made reasonable efforts to locate the parent and to reunify the child with the parent. As with Mrs. B. the question of location of the parent is settled. DCF has always known of and had contact with the father in this case. Father contends, as indicated above, that he did not receive the services due to him so that reunification might have happened between him and Amber. There are several answers to this contention. First the service providers, as indicated, stood ready to meet with and assist Mr. B. He was expected to show initiative on his part, which was not forthcoming. In addition he admitted to DCF and testified in court that he was not the primary parent. Finally the major assistance that he needed was with his alcohol problem. Mr. B. did not begin to comply with treatment for his alcoholism until four months before the TPR was filed. The record indicates therefore that DCF made reasonable efforts at reunification.
The term "reasonable efforts" was recently addressed by this court. . . . The word reasonable is the linchpin on which the department's efforts in a particular set of CT Page 5103 circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word "reasonable" nor the word "efforts" is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible.
In re Tabitha T., 51 Conn. App. 595, 602 (1999) (citations omitted).
Again Amber was committed on May 15, 1996, and at the time of the filing of the TPR on January 12, 1998, Mr. B. had not risen to the level of being a useful parent for Amber, nor would that status be achieved in a reasonable time. In re Migdalia M; In reLuis C., supra. On more than one occasion, Mr. B. informed DCF that he did not intend to take part in parenting classes and thought them inapplicable to him.
Of more importance was Mr. B's failure to cure his alcohol dependency as he promised to do in setting goals with DCF at the time of the entry of the expectations of February 7, 1996, and explicitly in the expectations of September 17, 1996. Of course when he was "ready," Mr. B. did attend the SATU program in late 1997 and early 1998. At the time of the filing of the TPR, there was no assurance that he would complete the SATU program and any after-care. In addition in November, 1997, he had already had a "slip. " This failure to comply with this central expectation for the return of Amber to a safe environment justifies finding a lack of rehabilitation. In re Shavoughn K., supra.
With regard to the TPR ground of § 17a-112(c)(3)(D), no ongoing parent-child relationship, the court finds for the respondents on two grounds. First the child was taken from the family at three weeks before the development of any relationship,In re Kelly S., 29 Conn. App. 600(1992). Secondly there was no proof of lack of positive memories of parents, In re Kezia M.,33 Conn. App. 12, 632 A.2d 1122 (1993).
The court has therefore found one adjudicatory ground alleged by DCF as regards mother and father. The court also finds by clear and convincing evidence that the facts warranting adjudication have existed for more than one year prior to the filing of the petition.
DISPOSITION
CT Page 5104
Having found that the grounds exist for termination of parental rights, the court must now consider the appropriate disposition. Here, the focus is not on the parents directly, but on the best interests of the child, Amber. The court may consider the evidentiary time-frame up to the present. In re Tabitha P.,supra at 367. The following are the required findings of General Statutes § 17a-112(e):
1. Appropriate and timely services were provided to father and mother by DCF, including psychological counseling, transportation assistance, parenting and substance abuse counseling, and visitation coordination. The specifics of the assistance are discussed above.
2. The court finds that DCF made reasonable efforts to reunify the biological parents with the child, given the situation and circumstances discussed above. Mother was repeatedly favored with services as described above, but was in part unwilling and in part unable to cooperate fully. She has not resolved the difficulties with her parenting and providing a safe home for Amber which led to the commitment in 1995. Father as the secondary parent is not a resource for care of Amber and has also not resolved his alcohol dependency. These are the reasons that DCF's reasonable efforts failed.
3. DCF, with the approval of the court, set reasonable and realistic expectations in order to reunify the family. Mother and father failed to comply fully with expectations as indicated above.
4. Amber has strong emotional ties with her foster family, and no ties at all with her biological mother or biological father.
5. Amber is 3 1/2 years old. She is in need of a permanent resolution of the uncertainty and threats to her life which have dominated her existence to date. "[T]ime is of the essence in custody cases." In re Alexander V. 25 Conn. App. 741, 748 (1992);In re Pamela B., 244 Conn. 296, 340 (Judge Berdon concurring) (1998).
6. Father made little effort to adjust his circumstances, and mother was in part unwilling and in part unable, due to her lack of parenting abilities, to confirm her conduct to acceptable CT Page 5105 parental standards. Giving them additional time would not likely bring their performance as parents within acceptable standards to make it in the best interests of Amber to be reunited. The court relies upon father's secondary role as parent and his continued alcohol dependency and mother's failure to have the sustained ability to parent, and the nature of the foster parents' contacts where bonding has occurred.
7. While the parents means were limited, economic factors did not prevent regular, continued contact by parents with Amber or the foster parents. All parties lived in reasonable geographic proximity. DCF encouraged contact between father, mother and child and provided services in light of the biological parents financial status. No unreasonable conduct by DCF occurred; indeed testimony indicated that DCF acted quite reasonably under the circumstances of this case.[20]
The court notes that Amber's counsel has recommended immediate termination of parental rights. The court further notes that neither mother nor father is capable of taking Amber into the family residence today. Mother at the time of the TPR hearing had not restored her parenting abilities and as described by Dr. Berkowitz was suffering from a personality disorder. Father at the time of this hearing according to Dr. Berkowitz had no plan for Amber and was still alcohol-impaired.
Alison F. was suggested as a resource. But Dr. Berkowitz has found that she offered her name late in the process, after bonding had occurred with foster parents. Further there was no showing that F. would impose the control required as a parent, but would merely act as a conduit for mother to have contact with the child. The court concludes that Alison F. is not a proper resource. Naming F. as custodian of Amber would clearly delay her development.
The court finds, based upon the testimony and evidence presented by clear and convincing proof, that it is in Amber's best interest to terminate the rights of Mr. and Mrs. B. to her. These findings are made after considering Amber's needs, the length of time she has been separated from her family of origin, her need for a secure and permanent environment, the relationship she has with her foster parents, and the totality of circumstances surrounding her short life.
Based upon the foregoing findings, the court determines that CT Page 5106 it is in Amber's best interests for a termination of parental rights to enter with respect to the biological parents, Mr. and Mrs. B. and it is ORDERED that the parental rights of Mr. and Mrs. B. are terminated. DCF is hereby appointed the statutory parent. A permanency plan for Amber shall be submitted within ninety days. A review plan for her shall be filed in accordance with state and federal law.
Henry S. Cohn, Judge
[2] Parents' explanation for this injury to Amber was that another sibling (then age three) had placed, or dropped, Amber in the hot water in the middle of the night while the parents slept. Dr. Barbara Berkowitz, a court-appointed psychologist, states in her report that the likelihood of this explanation is in doubt. She questions how likely it was that mother did not hear the older child remove Amber from the bassinet placed within five feet of parents' bed.
[3] Contrary to mother's contention, YIHCAPS services was not disrupted in any significant way due to payment issues.
[4] Exhibit C rebuts mother's contention that only D.J. was the subject of the Boy's Village referral.
[5] Prior to Amber's birth the Coordinating Council for Children in Crisis ("4C's") had worked with the family. In 1997, 4C's was approached and asked to consider renewing its contacts with the B. family, but the agency declined.
[6] A similar report was given by New Haven Family Alliance to DCF on December 8, 1996. Social Study, Exhibit I., Page 26.
[7] This course was completed one year after Mrs. B. had signed an expectation regarding parenting classes.
[8] While Mrs. B. contends that DCF broke "state and federal law" no demonstration of this has been made to the court's satisfaction. See Gen. Stat. 19a-583(a)(4).
[9] This information was supposedly supplied to 4C's by Mrs. B. At trial she denied furnishing the information to 4C's.
[10] Mother also told Dr. Berkowitz that she was the primary caretaker because father worked full time. (See Transcript of CT Page 5107 January 13, 1999 at 10.)
[11] In 1995 DCF arranged for a psychological examination of Mr.B. Subsequently he asked for further psychological evaluations. He claimed that DCF ignored his requests for help. This claim does not stand up in light of father's refusal to proceed with the ABH evaluation in 1996.
[12] This paragraph contains post-adjudicative facts and is for disposition only.
[13] The facts found in this section after January 1998 are for disposition only.
[14] According to social worker Limato, it is common to allow for additional services if requested by the parents during the time the TPR is pending. (See Transcript January 15, 1999 at 65).
[15] Mr. B. often states that he is now alcohol free. (See Transcript January 15, 1999 at 116). He told Dr. Berkowitz that he had one year of sobriety. Then he continues by telling her of his "slips." He testified in court that he lived a sober life yet he moved out of the house in September 1998 for a few days because Mrs. B. objected to his drinking. (See Transcript January 15, 1999 at 120).
[16] Amber's developmental delays, according to Alison F., were nothing more than small setbacks which she had seen in other female members of her family.
[17] In the adjudicatory phase, the court is limited to events preceding the filing of the petition or the latest amendment. "Practice Bk. § 33-3(a) (1998); In re Tabitha P.,39 Conn. App. 353, 367 (1995).
[18] Citations are to the General Statutes before the amendment of P.A. 98-241.
[19] In light of this finding, father's motion to dismiss is denied.
[20] The court's inquiry about a possible suit against DCF was made in the context of whether the evidence about the blood transfusion should be admitted. It was not made to indicate that CT Page 5108 DCF had engaged generally in wrongdoing. (See Transcript of January 13, 1999 at 100).